IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| STUART HYTTINEN, TAMARA HYTTINEN, RICHARD LUICK, and JOYE LUICK, individually and on behalf of all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br><br>THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); TYCO FIRE PRODUCTS, L.P., successor-in-interest to The Ansul Company; JOHNSON CONTROLS INTERNATIONAL, PLC; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise; CORTEVA, INC.; DUPONT DE NEMOURS INC., f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.; DYNAXCORPORATION; CLARIANT CORPORATION;  BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; AMEREX CORPORATION; ARCHROMA MANAGEMENT LLC; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL COMPANY; and CHEMICALS, INC.<br><br>Defendants. | Case No.:<br><br><br><br>**COMPLAINT AND JURY TRIAL DEMAND** |

**SUMMARY OF CLAIMS**

1.      Plaintiffs Stuart Hyttinen, Tamara Hyttinen, Richard Luick, and Joye Luick

(*hereinafter* "Plaintiffs"), by and through undersigned counsel, file this action against THE

3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.) ("3M");  TYCO FIRE

PRODUCTS, L.P., successor-in-interest to THE ANSUL COMPANY ("TYCO"); JOHNSON

CONTROLS INTERNATIONAL, PLC, successor-in-interest to TYCO ("JOHNSON CONTROLS"); CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY FC, LLC, individual and as successor in interest to DuPont Chemical Solutions Enterprise; CORTEVA, INC.; DUPONT DE NEMOURS INC., f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.; DYNAX CORPORATION; CLARIANT CORPORATION; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; AMEREX CORPORATION; ARCHROMA MANAGEMENT LLC; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL COMPANY; and CHEMICALS, INC. (collectively referred to herein as the "Defendants"), and allege as follows:

2.      Plaintiffs and Class Members are current and former residents of The Town of Campbell, Wisconsin (*hereinafter* "the Town"). The aquifer which supplies water to Plaintiffs' and Class Members' private household wells within the Town has been contaminated by the presence of chemicals designed, manufactured, sold, and/or distributed by Defendants.

3.      Plaintiffs and Class Members bring this class action against Defendants for injuries suffered by persons who at relevant time occupied residential real property in the Class Geographic Area (*hereinafter* the "Class Area"), and were injured due to significant exposure to per- and polyfluoroalkyl substances (*hereinafter* "PFAS") contained in aqueous film forming foam (*hereinafter* "AFFF"), a fire suppressant, designed, manufactured, sold, and/or distributed by Defendants.

///

4.      Defendants designed, manufactured, sold, and/or distributed AFFF containing toxic PFAS components with knowledge of and with inadequate warnings of the toxic effects AFFF and/or its toxic PFAS components would cause if they were released into the environment and consumed by humans. Defendants continued this conduct without regard to Plaintiffs and the Class Members who would foreseeably be exposed to these chemicals once they infiltrated the environment, including groundwater and private wells.

5.      For decades the Defendants manufactured, sold, and/or distributed AFFF, and its toxic PFAS components, to the City of La Crosse (*hereinafter* "La Crosse") and La Crosse Regional Airport (*hereinafter* "LSE"), in La Crosse, Wisconsin. LSE is located on French Island, Wisconsin, within the borders of La Crosse, directly adjacent to the Town surrounding its boundaries to the west and south, and the Black River to its east.

6.      Over five decades, releases of AFFF containing toxic PFAS components from LSE migrated into groundwater and private household wells in the Class Area. Without knowledge of this toxic PFAS contamination, Plaintiffs and Class Members have been exposed to and ingested toxic PFAS components from AFFF, sold, and/or distributed by Defendants and released at LSE.

7.      Plaintiffs and Class Members seek to be made whole for the cost of diagnostic testing for early detection of illness, disease, and disease process made medically necessary by their significant exposure to toxic PFAS components from Defendants' AFFF released from LSE, also known as medical monitoring.

8.      Residents in the Class Area have obtained their drinking water from groundwater pumped by private wells. For decades, Plaintiffs' and Class Members' household water has been contaminated by toxic PFAS components of Defendants' AFFF, which include

perfluorooctane sulfonate (*hereinafter* "PFOS"), perfluorooctanoic acid (*hereinafter* "PFOA"), perfluoroheptanoic acid (*hereinafter* PFHpA), and other species of PFAS. Plaintiffs' and Class Members' exposure to and consumption of known toxic PFAS components from AFFF has increased, and continues to increase, the likelihood they will develop an illness, disease, or disease process that they otherwise would not without such significant exposure.

9.      PFAS are known hazardous chemicals and substances. When PFAS from AFFF are ingested and absorbed into a person's bloodstream and tissue, they bioaccumulate, biomagnify, and remain in their bodies for years. As a result, consumption of toxic PFAS components from AFFF are known to alter the structure of persons' bodies and cause an increased risk of illness, disease, and disease process, including but not limited to thyroid disease, testicular cancer, and kidney cancer.

10.     As a result of LSE's releases of Defendants' AFFF, and its toxic PFAS components, throughout the Class Area, in 2021 Wisconsin Department of Health Services (*hereinafter* "WDHS") advised residents in the Class Area not to use or drink their water due to the PFAS contamination.

11.     The risks of illness, disease, and disease process from significant exposure to toxic PFAS components from AFFF has plagued, and will continue to plague, Plaintiffs and Class Members. As a result, Plaintiffs and Class Members have been injured by the acts and/or omissions of Defendants that caused toxic PFAS components in AFFF to contaminate household water supplies throughout the Class Area which they then used and consumed water.

12.     The Defendants' AFFF and its toxic PFAS components included fluorochemical surfactants, including PFOS, PFOA, and/or certain other PFAS that degrade

into PFOS or PFOA.  As the manufacturers, sellers, and/or distributors of AFFF and its toxic PFAS components, the Defendants knew or should have at least known since at least the 1960s and 1970s that the inclusion of toxic PFAS components in AFFF presented an unreasonable risk to human health and the environment.  Defendants also knew or should have known by that time that PFAS are highly soluble in water, and highly mobile and persistent in the environment, and therefore are highly likely to contaminate water supplies if released into the environment.

13.     Nonetheless, Defendants manufactured, marketed, sold, and/or distributed their products with knowledge that large quantities of AFFF containing toxic PFAS components would be used in fire training exercises and emergency situations, including at LSE, in a manner such that toxic PFAS components would be released into the environment. Defendants knew or should have known that even when used as intended, discharge of AFFF, and its toxic PFAS components, into the environment was certain to cause environmental and health hazards.

14.     Sites in the Class Area have been linked to surface, groundwater, and household water supplies contaminated with toxic PFAS components from Defendants' AFFF.

15.     The Plaintiffs and Class Members in the Class Area and their individual properties have been exposed for years, if not decades, to toxic PFAS components from AFFF including at concentrations hazardous to human health. Plaintiffs and Class Members had no way to know that they were consuming water contaminated with toxic PFAS components until the contamination was disclosed to them.

16.     La Crosse and LSE routinely used Defendants' AFFF as intended in fire training exercise, fighting fires, in annual testing, and for other purposes for decades. As a

result, toxic PFAS components used in Defendants' AFFF migrated into the groundwater at
LSE and into a flow zone around LSE, contaminating private wells used to supply Plaintiffs
and Class Members in the Class Area with household water.

17.     Sampling and testing in the Class Area have detected PFAS at levels hazardous
to human health.

18.     Plaintiffs and Class Members ingested PFAS contaminated water because of
Defendants' tortious conduct in developing, manufacturing, selling, and/or distributing AFFF.
Plaintiffs and Class Members absorbed PFAS-contaminated water into their body tissue and
bloodstream, altering their bodies' biochemical processes, structure, and/or function in a way
that leads to latent illness, disease, or disease process.

19.     Plaintiffs' and Class Members' significant exposure to toxic PFAS components
in AFFF have caused them bodily harm in the form of detrimental alteration of the structure
and/or function of their bodies, and therefore past, present, and future injury.

20.     As a result of Plaintiffs' and Class Members' significant exposure to PFAS
from AFFF, they have suffered past, present, and future increased risk of PFAS related illness,
disease, and disease processes. PFAS related illness, disease, and disease process are often
latent or misidentified, making specialized diagnostic testing for early detection of PFAS
related illness, disease, or disease process medically reasonably necessary and beneficial.
Because of Plaintiffs' and Class Members' significant exposure to toxic PFAS components
from AFFF they have incurred the pecuniary loss and injury of the costs associated with such
medically necessary diagnostic testing and medical tests.

21.     As a result of the contamination, Plaintiffs and Class Members presently
require and, in the future will require, diagnostic testing to ensure early detection of illness,

disease, and disease process caused by exposure to toxic PFAS components in Defendants' AFFF. It is well-known that many of the serious illness, disease, and disease process caused by toxic PFAS exposure can be asymptomatic in the patient prior to the manifestation of significant and sometimes fatal illness or disease.

22.     Toxic PFAS components contained in Defendants' AFFF have created an increased risk of illness, disease, and disease processes for Plaintiffs and Class Members using private groundwater wells within the Class Area.

23.     It is beneficial to Plaintiffs and Class Members to know of any latent illness, disease, and disease processes from their exposure to PFAS contaminated water because of Defendants' design, manufacture, sale, and/or distribution of AFFF to LSE. Therefore, Plaintiffs' and Class Members' injuries make it reasonably necessary that Plaintiffs and Class Members incur the costs of present and future medical monitoring. Notice and diagnostic plans described herein will equip Plaintiffs, Class Members, and their doctors with the requisite knowledge to take appropriate steps to protect themselves from latent illness, disease, and disease process.

24.     Defendants' tortious conduct constitutes an invasion of Plaintiffs' and Class Members' legally protected interests in the form of past, present, and future increased risk of illness, disease, and disease process from their significant exposure to toxic PFAS components from AFFF.

25.     Defendants' tortious conduct constitutes an invasion of Plaintiffs' and Class Members' legally protected interests in the form of past, present, and future injury of pecuniary loss of the cost of medically necessary diagnostic testing for the early detection of illness, disease, and disease process caused by their significant exposure to toxic PFAS

components from AFFF and their consequent increased risk of illness, disease, and disease process.

26.     The Plaintiffs and Class Members bring this suit on behalf of themselves and all those similarly situated to recover costs of medical monitoring for the early detection of illness, disease, and disease process caused by the PFAS water contamination crisis in the Town and Plaintiffs' and Class Members' private household wells caused by the Defendants' tortious conduct.

## PARTIES

### A.  PLAINTIFFS

27.     Plaintiffs are individuals, all of whom, at all relevant times to this action, owned, occupied, and/or used private drinking wells within the Class Area, and were exposed to and ingested toxic PFAS components for at least one year over the past five decades of LSE's use of Defendants AFFF.

28.     Plaintiffs, Stuart and Tamara Hyttinen, at all relevant times to this action, were and are residents of the Town, within the Class Area. Stuart and Tamara Hytinnen are significantly exposed to, and ingested, PFAS contaminated household water supply because of LSE's use of Defendants' PFAS-based AFFF as describe below.

29.     Plaintiffs, Richard and Joye Luick, at all relevant times to this action, were and are a resident of the Town, within the Class Area. Richard and Joye Luick are significantly exposed to, and ingested, PFAS contaminated household water supply because of LSE's use of Defendants PFAS-based AFFF as describe below.

///

///

**B.  DEFENDANTS**

30.     Defendant 3M is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133. Beginning before 1970 and until at least 2002, 3M manufactured, sold, and distributed AFFF. Defendant 3M sold military specification AFFF that contained toxic PFAS components to airports, including LSE.

31.     Defendant Tyco is a limited partnership organized and existing under the laws of the State of Delaware, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.  Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company (hereinafter "Ansul" and included in any reference to Tyco).

32.     At all times relevant, Tyco manufactured, sold, and/or distributed fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS. Defendant Tyco sold and/or distributed AFFF to airports, including LSE.

33.     Defendant, Johnson Controls is a corporation organized and existing under the laws of Ireland, having a principal place of business at 5757 N. Green Bay Ave., Milwaukee, WI 53209. On or about September 2, 2016, Johnson Controls merged with a subsidiary of Tyco's parent company, Tyco International plc, named Jagara Merger Sub LLC. Johnson Controls was the surviving corporation. After the merger, Tyco International plc changes its name to Johnson Controls International plc.

34.     Tyco is an indirect subsidiary wholly owned by Johnson Controls. Since on or around September 2, 2016, Tyco and Johnson Controls have maintained service agreements under which Johnson Controls provides certain services, including environmental consulting and

management, to Tyco. Since that time, Johnson Controls has authorized, supervised, directed, performed, or failed to perform the acts alleged in this Complaint.

35.     Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

36.     Chemguard is an indirect subsidiary wholly owned by Johnson Controls, acquired by Tyco in 2011.

37.     At all times relevant to the present litigation, Chemguard designed, manufactured, and sold AFFF containing PFAS that was used in training operations and to fight fires at airports and other locations throughout the country, including at LSE.

38.     National Foam, Inc. (a/k/a Chubb National Foam) is a Delaware corporation, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

39.     At all times relevant to the present litigation, National Foam Inc. designed, manufactured, and sold AFFF containing PFAS that was used for training and to fight fires at numerous airports and other locations throughout the country, including LSE.

40.     Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc. ("Kidde Fire") is a Pennsylvania corporation having a principal place of business at One Carrie Place, Farmington, Connecticut. At all times relevant to the present litigation, Kidde Fire designed, manufactured, and sold AFFF containing PFAS that was used in training operations and for emergency fire-fighting situations, including at LSE.

41.     Kidde PLC, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc. ("Kidde"), is a Massachusetts corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302. At all times relevant to the present litigation, Kidde

designed, manufactured, and sold AFFF containing PFAS that was used in training operations and for emergency fire-fighting situations, including at LSE.

42.     Kidde-Fenwal, Inc. ("Kidde Fenwal") is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721. At all times relevant to this litigation, Kidde- Fenwal designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations, including at LSE.

43.     Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to Kidde-Fenwal, Inc.

44.     Upon information and belief, the Canadian Intellectual Property Office has registered the National Foam trademark to Kidde-Fenwal, formerly registered to Kidde Fire.

45.     UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc. ("UTC Fire"), is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.  At all times relevant to this litigation, UTC Fire designed, manufactured, and sold AFFF used for training operations and fighting fires, including at LSE.

46.     Upon information and belief, Kidde-Fenwal is part of the UTC Climate Control & Security unit of United Technologies Corporation.

47.     Enterra Corporation ("Enterra") is a Massachusetts corporation.  At all times relevant, Enterra designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous airports, including at LSE.

48.     Upon information and belief, Enterra is the current holder of the National Foam trademark.

///

11

49. Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

50. On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde- Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde- Fenwal's design, manufacture, marketing, sale, and distribution of AFFF.

51. National Foam, Inc.; Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., individually and as successor in interest to National Foam, Inc.; Kidde Plc, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc.; Kidde-Fenwal, Inc., individually and as successor in interest to National Foam, Inc.; UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc.; Enterra Corporation;  and Carrier Global Corporation, individually and as successor in interest to National Foam, Inc. are collectively referred to herein as "National Foam."

52. At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations, including at LSE.

53. Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye does business throughout the United States, including conducting business in Wisconsin.

12

54.     At all times relevant to the present litigation, Buckeye Fire designed, manufactured, sold, and/or distributed AFFF containing PFAS used in training operations and for emergency fire-fighting situations, including at LSE.

55.     DuPont Chemical Solutions Enterprise ("DuPont Chemical") was a Delaware Corporation, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19898.

56.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

57.     In a letter addressed to the Office of Pollution Prevention and Toxics ("OPPT") Document Control Office, dated May 14, 2003, and signed by Stephen H. Korzeniowski, DuPont provided its list of telomer-based sales products in the United States for the year 2002.

58.     The letter, which was redacted and sent to the United States Environmental Protection Agency (*hereinafter* "EPA") under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[1]

59.     At all times relevant to the present litigation, DuPont Chemical designed, manufactured and sold AFFF used for training and to fight fires at numerous locations including airports across the United States.

60.     Defendant, E.I. Du Pont de Nemours and Company ("E.I. DuPont"),

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621, last accessed 9.22.20.

successor in interest to DuPont Chemical, is a Delaware Corporation and does business throughout the United States, including conducting business in Wisconsin. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

61.     At all times relevant to the present litigation, E.I. DuPont designed, manufactured and sold AFFF used for training and to fight fires at numerous airports and other locations throughout the country, including LSE.

62.     Defendant The Chemours Company ("Chemours"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including conducting business in Wisconsin. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19889.

63.     Chemours was incorporated as a subsidiary of E.I. Du Pont as of April 30, 2015. From that time until July 2015, Chemours was a wholly owned subsidiary of E.I. Du Pont. In July 2015, E.I. Du Pont spun off Chemours and transferred to Chemours its "performance chemicals" business line, which included the fluoroproducts business, distributing shares of Chemours stock to E.I. Du Pont stockholders, and Chemours has since been an independent, publicly traded company.

64.     Upon information and belief, at all times relevant to the present litigation, Chemours designed, manufactured,  and sold AFFF used for training and to fight fires at numerous airports and other locations throughout the county, including LSE.

65.     E.I. Du Pont merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. ("DowDuPont"). E.I. Du Pont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has affected a series of

separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

66.     Defendant The Chemours Company FC L.L.C. ("Chemours Company"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including conducting business in Wisconsin. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

67.     Upon information and belief, at all times relevant to the present litigation, Chemours Company designed, manufactured and sold AFFF used for training and to fight fires at numerous airports and other locations throughout the country, including LSE.

68.     Defendant DuPont de Nemours Inc. ("DuPont"), f/k/a DowDuPont, is a Delaware Corporation that conducts business throughout the United States, including business in Wisconsin. Its principal place of business is 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

69.     Upon information and belief, at all times relevant to the present litigation, DuPont de Nemours manufactured, designed and sold AFFF and/or PFAS constituents in AFFF that was used at LSE.

70.     Defendant Corteva, Inc. ("Corteva") is a Delaware Corporation that conducts business throughout the United States, including business in Wisconsin. Its principal place of business is 974 Centre Rd., Wilmington, Delaware 19805.

71.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

///

15

72.     Corteva, Inc. was initially formed in February 2018.  From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

73.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of DuPont and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

74.     At all times relevant to the present litigation, Corteva designed, manufactured and sold AFFF and/or PFAS constituents in AFFF that was used at LSE.

75.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva, Inc.

76.     Defendants E. I. DuPont; Chemours; Chemours Company; Corteva; and New DuPont are collectively referred to as "DuPont" throughout this Complaint.

77.     Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States, including business in Wisconsin.  Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

78.     In 1991, Dynax Corporation (f/k/a Daikin-TLIM Co., Ltd.) entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

79.     Upon information and belief, at all times relevant to the present litigation, Dynax designed, manufactured and sold AFFF and/or PFAS constituents in AFFF that was used at LSE.

80.     Defendant BASF Corporation, ("BASF"), is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

81.     On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

82.     On information and belief, BASF Corporation is the successor in interest to Ciba- Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc. ("Ciba-Geigy"), Swiss specialty chemicals companies.

83.     Ciba-Geigy manufactured and sold PFAS or PFAS components for use in AFFF, including at LSE.

84.     Defendant ChemDesign Products, Inc. ("Chemdesign") is a corporation organized and existing under the laws of Texas and having a principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

85.     ChemDesign manufactured PFAS or PFAS constituents for Tyco and Chemguard to use in AFFF, including at LSE.

86.     Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

87.     Arkema develops specialty chemicals and fluoropolymers.

///

88.     Arkema is a successor in interest to Elf Atochem North America ("Elf Atochem") and Atofina Chemicals Inc ("Atofina").

89.     Arkema, Elf Atochem and/or Atofina Chemicals manufactured and sold PFAS or PFAS constituents for use in AFFF, including at LSE.

90.     Defendant AGC Chemicals Americas Inc. ("AGC Americas") is a corporation organized and existing under the laws of Delaware, having a principal place of business in 5 East Uwchlan Avenue, Suite 201, Exton, PA 19341. AGC Americas operates throughout the United States, manufacturing glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

91.     AGC Americas manufactured and sold PFASs or PFAS constituents for use in AFFF that was used at LSE.

92.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

93.     Upon information and belief, Clariant was formerly known as Sandoz Chemicals Corporation ("Sandoz") and as Sodyeco, Inc ("Sodyeco").

94.     On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz"). On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

95.     Clariant, Sandoz, and/or Sodyeco manufactured and sold PFAS or PFAS constituents for use in AFFF, including at LSE.

96.     Defendant Amerex Corporation ("Amerex") is a corporation organized and

existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

97.     Defendant Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

98.     In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

99.     On information and belief, beginning in 2011, Amerex designed, manufactured, marketed, sold, and distributed AFFF containing PFAS, including but not limited to PFOA and PFOS, that was used at LSE.

100.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

101.    On information and belief, Deepwater Chemicals designed, manufactured, marketed, sold, and distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were used at LSE.

102.    Defendant Archroma Management LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its a principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

103.    On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

///

104.    On information and belief, Archroma designed, manufactured, marketed, sold, and distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used at LSE.

105.    Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

106.    On information and belief, Chemicals, Inc. supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used at LSE.

107.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

108.    On information and belief, Nation Ford supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used at LSE.

109.    On information and belief, the Defendants supplied, manufactured, marketed, sold, and distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at LSE.

110.    All Defendants, at all times material herein, acted by and through their respective agents, servants, officers, and employees, actual or ostensible, who were acting within the course and scope of their actual or apparent agency, authority or duties, Defendants are liable based on such activities, directly and vicariously.

111.    Defendants represent all or substantially all the market for AFFF and toxic PFAS components used, discharged, released, and disposed of at LSE.

## JURISDICTION AND VENUE

112.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d) because at least some members of the proposed Plaintiff class are citizens of states different from at least some of Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

113.    Venue is proper in this court pursuant to 28 U.S.C. § 1391 because events or omissions by Defendants giving rise to the claims asserted herein occurred in this District, have injured Class Members residing in this District and Plaintiffs and Class Members reside in this District.

## GENERAL ALLEGATIONS

114.    PFAS are manmade chemicals that do not exist in nature. Defendants manufactured and used toxic PFAS components to produce AFFF which was sold and/or distributed to airports across the United States, including LSE.

115.    PFAS are persistent in the environment. Due to the strength of multiple carbon-fluorine bonds, PFAS break down slowly in the environment, are chemically biologically stable, resistant to environmental degradation, and can persist in the environment for decades. PFAS are also water soluble, making them mobile in groundwater and the environment.

116.    Toxicology studies show that after oral exposure, PFAS are readily absorbed into the human bloodstream and tissue and accumulate in the human body.

117.    There are numerous health risks associated with exposure to PFAS. For example, PFOS and PFOA exposure is associated with increased risk in humans of testicular

cancer and kidney cancer, disorders such as thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension, and other conditions.[2] The EPA has also advised that exposure to PFAS may result in developmental effects to fetuses during pregnancy or to breast-fed infants.[3]

118. AFFF use at LSE in firefighting dates from the 1970s through 2020. Storage of AFFF persists at LSE.

119. Toxic PFAS components from AFFF released at LSE have migrated, and continue to migrate, from areas of release on LSE to the wells throughout the Class Area and have entered and contaminated Plaintiffs' and Class Members' real property, water rights, wells, and water systems including household piping.

120. Plaintiffs and Class Members resided in residential properties with private wells within the Class Area.

121. Concentrations of toxic PFAS components found in the private household wells serving Plaintiffs' and Class Members' water supplies has been caused by LSE's releases of Defendants' AFFF into the environment. As was reasonably foreseeable by Defendants, AFFF containing toxic PFAS components was discharged onto open ground and surface waters during fire training, fire suppression, and other exercises. As was reasonably foreseeable by Defendants, AFFF, including toxic PFAS components, migrated into and through the soil in and around LSE to the groundwater under LSE. From there, AFFF, and its toxic PFAS components, migrated to Plaintiffs' and Class Members' private groundwater wells in the Class Area which are now contaminated. PFAS contamination in the Class Area is therefore directly and proximately

---

[2]https://www.epa.gov/sites/production/files/201605/documents/drinkingwaterhealthadvisories_pfoa_pfos_5_19_16.final_.1.pdf
[3] *Id.*

linked to Defendants' manufacture, sale, and/or distribution of AFFF containing toxic PFAS components.

122.    Because of Defendants' tortious conduct in manufacture, sale, and/or distribution of AFFF containing toxic PFAS components, Plaintiffs and Class Members have been forced to cease use of their private household wells because PFAS have contaminated their water supply.

123.    Plaintiffs and Class Members took, and continues to take, delivery of a substitute water supply out of necessity to avoid consumption of PFAS contaminated water caused by Defendants' AFFF.

124.    Defendants knew and/or reasonable should have known that manufacture, sale, distribution, and intended use of AFFF would release toxic PFAS into the soil and groundwater in the Class Area, and the household water consumed by Plaintiffs and Class Members. Thus, Defendants, through their development, manufacturing, marketing, sale, and/or distribution of AFFF and/or the toxic PFAS components used in AFFF, proximately caused Plaintiffs' and Class Members' injuries by contaminating their groundwater and household water supplies, which they then congested.

## PFAS ARE USED IN AQUEOUS FILM FORMING FOAM

125.    PFAS are synthetic carbon chain compounds that contain large amounts of the element fluorine and are not naturally occurring. As used in this Complaint, the term "PFAS" includes all PFAS and their precursors, derivatives, and/or salts used in the AFFF used at LSE which contaminated Plaintiffs' and Class Members' water supplies and property, including inter alia, PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, PFDA, PFDS, PFUnA, PFDoA, and PFTrA.

126.     PFAS are used in firefighting foam known as "aqueous film forming foam," commonly referred to as "AFFF."

127.     AFFF is used to extinguish fires that involve petroleum or other flammable liquid because PFAS are resistant to heat, oil, grease, and water.

128.     3M AFFF, which is produced through a 3M process called electrochemical fluorination, or ECF, contained toxic PFAS components including PFOS. AFFF formulations purchased and/or manufactured by Tyco and other Defendants are synthesized through telomerization and contain toxic PFAS components including PFOA. Both processes include formulations containing chemicals that can break down into other toxic PFAS components.

129.     Defendants each manufactured, sold, and/or distributed AFFF that contained toxic PFAS components and was used at LSE.

130.     Defendants chose to include and/or distribute toxic PFAS components as ingredients in the AFFF sold and distributed to AFFF users, including LSE, despite the availability of other technologically feasible, practical, and effective alternatives that would have reduced or mitigated Plaintiffs' and Class Members' exposure to toxic PFAS.

131.     Defendants knew or should have known that the AFFF, and its toxic PFAS components, sold, and/or distributed to users of AFFF, including LSE, would be released into the environment and contaminate groundwater and household water supplies, including Plaintiffs' and Class Members' water supplies.

132.     Defendants knew or should have known that their harmful and defective product, AFFF containing toxic PFAS components, would be used for various purposes at airports including, but not limited to, training for firefighting, testing firefighting equipment, actual firefighting, and use in hangar sprinkler fire suppressant systems. Defendants also knew or

should have known such use would cause the AFFF to drain into the ground and eventually migrate to and contaminate the groundwater beneath and adjacent to the airports, including Plaintiffs' and Class Members' household water supplies.

133.    Toxic PFAS components have been and continue to be detected in private wells throughout the Private Class Area bordering LSE.

### PFAS, Including PFOA and PFOS, Threaten Human Health

134.    Humans absorb toxic PFAS components contained in AFFF when they consume AFFF contaminated household water. PFAS then accumulate primarily in the blood stream, kidneys, and liver.

135.    PFAS are extremely persistent and bioaccumulate[4] in the human body. Even short-term exposure results in a body burden that persists for years and can increase and biomagnify[5] with continued exposure.  Accumulation of toxic PFAS inside the body for a continued period alters body structures and increase the risk of illness, disease, and disease process.

136.    The EPA projects that PFOS has a half-life of 5.3 years, PFOA has a half-life of 2.3-3.8 years, and PFHxS has a half-life of 8.5 years, in humans.[6] Because of these extended half-lives, the EPA expects that "it can reasonably be anticipated that continued exposure could increase body burden to level that would result in adverse outcomes."[7]

137.    EPA Health Advisories have identified numerous health risks associated with exposure to PFAS. Studies show association between increased PFOA and PFOS levels in

---

[4] Bioaccumulation is a process which occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism or excretion.
[5] Biomagnification is a process which occurs when concentration of a substance in organisms tissue increases as the substance travels up the food chain.
[6] A half-life is the amount of time it takes for fifty percent of a contaminant to leave the body.
[7] EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, pp. 1, 8-9, December 30, 2009.

blood and increased risk of several adverse health effects, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

138.    The EPA classified PFOA and PFOS as having suggestive evidence of carcinogenic potential in humans.[8]

139.    The EPA cited reports from the Organization for Economic Co-operation and Development (*hereinafter* "OECD") in the May 2016 Health Advisories. The OECD is an international intergovernmental organization that convenes, discusses issues of concern, and works to respond to international problems.

140.    According to a published OECD Report, for mammalian species, PFOA and its salts have been found to cause cancer in rats and adverse effects on the immune system in mice. In addition, PFOA and its salts can display reproductive or developmental toxicity in rodents at moderate levels of exposure, and moderate to high systemic toxicity in rodents and monkeys following long-term exposure by the oral route.[9] The OECD also concluded in a Hazard Assessment that PFOS is persistent, bioaccumulative, and toxic to mammalian species.[10]

141.    The EPA also cited findings from a C-8 Science Panel and Health Project in the May 2016 Health Advisory for PFOA. The C-8 Science Panel was formed out of a class action settlement related to PFOA contamination of groundwater from a manufacturing facility in West Virginia. The C-8 Health Project is the largest study evaluating human exposure and health endpoints for PFOA; the study included more than 65,000 people in Mid-Ohio Valley

---

[8] EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 3-159, May 2016; EPA, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS), p. 3-114, May 2016.

[9] OECD, Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007.

[10] OECD, Hazard Assessment of Perfluorooctane Sulfonate (PFOS) and Its Salts, p. 5, November 21, 2002.

communities who were exposed to PFOA for longer than one year. The C-8 Science Panel consisted of three epidemiologists and its goal was to assess the links between PFOA and numerous diseases. The C-8 Science Panel carried out studies of exposure and health studies between 2005 and 2013; information was gathered through questionnaires and blood samples from the individuals who had PFOA contaminated drinking water and previously published studies.

142.    The C-8 Science Panel released reports and found probable links between exposure to PFOA and six diseases: high cholesterol, ulcerative colitis, thyroid disease, testicular cancer, kidney cancer, and pregnancy-induced hypertension.

143.    The U.S. Agency for Toxic Substances and Disease Registry (*hereinafter* "ATSDR") stated in its 2018 draft Toxicological Profile that studies suggest associations between PFOA exposure and liver damage, pregnancy-induced hypertension, increased cholesterol, increased risk of thyroid disease, increased risk of asthma, increased risk of decreased fertility, low birth weight, and testicular and kidney cancers.

144.    In February 2018, Wisconsin Department of Natural Resources (*hereinafter* "WDNR") stated that PFAS compounds meet the definition of hazardous and/or environmental pollution under Wis. Stat. § 292.01. Three years later, prevalence of PFAS contamination Class Area led WDHS to declare an emergency water advisory for the Class Area.

145.    PFAS accumulates in the environment for years, the most common PFAS have half-lives between two and eight years with some remaining in the environment for longer. The chemical design of PFAS makes them highly mobile and persistent in the environment allowing them to invade and contaminate water supplies for decades.  When humans are exposed to, and ingest, toxic PFAS components they suffer a significantly increased risk of illness, disease, and

disease processes.

146.    Defendants knew or reasonably should have known about the health effects from toxic PFAS components, discussed above, at the time they developed, manufactured, marketed, sold, and/or distributed AFFF, and its toxic PFAS components, to airports around the United States, including LSE.

**PFAS, including PFOA and PFOS, Pose a Threat to Household Wells Relied on By Plaintiffs and Class Members**

147.    PFAS are extremely persistent in the environment because they are chemically and biologically stable and resistant to environmental degradation. The EPA projects that PFOS has an environmental half-life in water of over 41 years, and PFOA has an environmental half-life in water of over 92 years. PFOA and PFOS are also considered to be resistant to degradation in soil. EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, p. 1, December 30, 2009.

148.    PFAS also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

149.    Additionally, PFOA is persistent and can cause adverse effects in laboratory animals and humans, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species.  PFOS is linked to developmental, reproductive, and systemic toxicity.

150.    PFAS accumulates in the environment for years, the most common PFAS have half-lives between two and eight years with some remaining in the environment for longer.

151.    Further, PFOA and PFOS are not the only PFAS from AFFF found in Plaintiffs' and Class Members' household water. Mixtures of PFAS raise the likelihood of additive and

synergistic impacts on non-human receptors. It is likely that one or more other PFAS possess similar characteristics and pose similar threats of adverse health effects.

152.     The structure of toxic PFAS components in AFFF are highly mobile and persistent in the environment allowing them to invade and contaminate water supplies for decades as the environment, and humans are exposed to, and ingest, the toxic PFAS components which causes increased risk of illness, disease, and disease processes.

153.     Upon information and belief, Defendants knew or should reasonably have known about the environmental effects from PFAS, discussed above, at the time they developed, manufactured, marketed, sold, and/or distributed AFFF, and its toxic PFAS components.

**Defendants Knew of AFFF Toxicity and Failed to Provide Notice**

154.     Instructions, labels, and material safety data sheets (*hereinafter* "MSDS") were provided with AFFF and the toxic PFAS components used in AFFF sold by Defendants. At least at significant times such information, intended to advise users of the consequences of a products use, did not fully describe the health and environmental hazards of AFFF which Defendants knew or should have known.

155.     Defendants had known of these health and environmental hazards for years and, at least at significant times, failed to disclose this information about the toxic PFAS components in their AFFF, and actively hid such information from their customers, including LSE.

(i)     <u>1940s and 1950s: Early Warnings About the Persistence of AFFF</u>

156.     In 1947, 3M created its fluorochemical program. Within four years, it began selling PFOA to DuPont. The persistence and contaminating nature of fluorosurfactants contained in AFFF products were understood prior to their commercial application.

29

157.     The inventor of 3M's ECF process, J.H. Simons', 1948 patent for the ECF process reported that fluorosurfactants produced by the process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that the stability of carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[11]

158.     3M knew as early as the mid-1950s that PFAS bio-accumulate in humans and animals.

159.     A 1956 study at Stanford University concluded that PFAS manufactured by 3M bind to proteins in blood.

160.     Nowhere in any MSDS for any of Defendants' AFFF is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the toxic PFAS components and fluorosurfactants used in AFFF products to customers constitutes failure to warn just how indestructible the toxic PFAS components in Defendants' AFFF are when released to unprotected water sources and even treatment plants.

(ii)     1960s: AFFF's Environmental Hazards Are Made Clear

161.     By the early 1960s, 3M understood that PFAS are stable, persist in the environment, and do not degrade.

162.     DuPont company scientists issued internal warnings about the toxicity associated with their PFOA as early as 1961.

163.     One 3M employee wrote in 1964: "This chemical stability also extends itself to

---

[11] Simons, J.H., Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, 1950, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[12]   Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soil and groundwater.

164.    DuPont Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

165.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

(iii)    1970s: International Studies Provide Evidence of Environmental and Health Risks

166.    In 1970, the authors of a scientific journal article observed after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

167.    Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

168.    An internal memorandum from 3M in 1971 states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention."[13]   Hence, 3M understood at the very least that the fluorosurfactant used in its AFFF would, in essence, never degrade once released into the environment.

---

[12] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry, (1964), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

[13] Memorandum from H.G. Bryce to R.M. Adams re : Ecological Aspects of Fluorocarbons, Sept. 13, 1971, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

169.     By the mid-1970s, 3M and Ansul (and possibly other Defendants) had an intimate understanding of the persistent nature of PFAS. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS; a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated."[14]

170.     In 1977, Ansul authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality.[15]  Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic . . . improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness."  Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet there is no evidence that Ansul (or any other Defendant) ever pursued such initiatives.

171.     A 1978 study by 3M on PFOS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

172.     In 1978, DuPont received information from 3M about elevated and persistent fluorine levels in workers exposed to PFOA. Based on this information, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of

---

[14] Technical Report Summary, August 12, 1976 [3MA01252037].
[15] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a050508.pdf.

fluorine.

173.     By 1979, DuPont's blood sample data indicated workers exposed to PFOA had significantly higher incidence of health issues than unexposed workers. DuPont did not report this data or the results of its workers health analysis to any government agency or community.

174.     In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

175.     That same year, 3M and DuPont discussed 3M's discovery of PFOA in the blood of its workers and came to the same conclusion that there was "no reason" to notify the EPA of its finding.[16]

176.     In the 1970s, 3M began a major program to review personnel handling of fluorochemicals. 3M's monitoring confirmed that fluorochemicals could bioaccumulate.

            (iv)     1980s and 1990s: Evidence of AFFF Health Risks Compound

177.     By at least the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects. Research concluded that adverse health effects caused by toxic PFAS components contained in Defendants' AFFF include elevated liver enzymes and birth defects among workers exposed to such toxic PFAS materials, including at least PFOA. Such data was not published, provided to government entities as required by law, or otherwise publicly disclosed.

178.     In 1980, DuPont internally confirmed that PFOA "is toxic," that PFOA accumulates in human tissue, and that "continued exposure is not tolerable." Not only did

---

[16] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.

DuPont know PFOA accumulates in human tissue, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

179.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[17]

180.    A subsequent rat study in 1982 which DuPont reported to the EPA showed PFOA crossing the placenta and presence in the maternal blood, DuPont concealed the results of these internal studies from its own plant workers.

181.    No later than 1984, DuPont was aware that PFOA is also biopersistent.

182.    DuPont had long been aware that toxic PFAS components it released, and was releasing, from its facilities were leaching into groundwater used for public drinking water.

183.    In 1984, after obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

184.    DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

185.    DuPont chose not to use either available technologies or replacement materials, despite full knowledge of PFOA's toxicity.

---

[17] C-8 Blood Sampling Results, *available at* http://tiny.cc/v8z1mz.

186.     During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

187.     They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

188.     In 1984, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo:

> [W]e must view this present trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body.[18]

189.     A 1997 MSDS for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

190.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using toxic PFAS components, including at least 3M, DuPont, and Dynax Corporation, indicated that at least one such toxic PFAS component, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver and pancreatic).

(v)     Defendants Hid a Known Toxic Chemical from the Government and the Public

---

[18] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

191.     The potential loss of tremendous profits from PFAS drove 3M to engage in a deliberate campaign to influence the science related to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

192.     A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

193.     In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit the drafts of papers on PFAS and sought control over when or whether these papers were published at all.

194.     Under pressure from the EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than fifty years earlier.[19]

195.     3M, who was the predominant manufacturer of AFFF, ceased production of PFOS based AFFF in 2002.[20]

196.     An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."[21]

---

[19] 3M Press Release, "3M Phasing Out Some of Its Specialty Materials", May 16, 2000.
[20] http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1, last accessed 9.22.20.
[21] EPA Internal Memo, "Phaseout of PFOS", May 16, 2000, http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0629.pdf#page=2n, last accessed 9.22.20.

197.     In contrast, 3M's news release insisted that "our products are safe" while extolling their "principles of responsible environmental management" as driving the cessation of production.[22]

198.     In 2001, the Firefighting Foam Coalition (*hereinafter* "FFFC"), an AFFF trade group, was formed to advocate for AFFF's continued viability. DuPont, which as described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC along with many other AFFF manufacturers, including Ansul, Buckeye, Chemguard, and Dynax. Through their involvement in the FFFC, as well as a variety of other trade associations and groups, the FFFC and Defendants shared knowledge and information regarding PFOA. The FFFC and Defendants worked together to protect AFFF from scrutiny including close cooperation regarding messaging about PFOA's toxicological profile.

199.     The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFAS to human health and the environment. The FFFC and Defendants regularly published newsletters and attended conferences bolstering AFFF. Coordinated efforts between FFFC and Defendants were meant to dispel concerns about the impact toxic PFAS components in their AFFF have on the environment and human health. The FFFC and Defendants worked in concert to conceal known risks of their AFFF, and its toxic PFAS components, from the government and public.

200.     DuPont's Epidemiology Review Board (*hereinafter* "ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in 2006, the ERB "strongly advise[d]

---

[22] http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1, last accessed 9.22.20.

against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis for [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

201.    In the 1970s, Defendants began making AFFF with toxic PFAS components, including shorter carbon chain PFAS. Upon information and belief, those other PFAS also are highly soluble, persistent, bio-accumulative, and toxic to humans.

202.    AFFF containing toxic PFAS components were sold and/or distributed to La Crosse by Defendants. Thereafter, Defendants' AFFF was stored, used, released, discharged, and disposed of at LSE, which has contaminated Plaintiffs' and Class Members' household water supplies and caused them to be exposed to and ingest toxic PFAS components. For instance, PFAS have been detected in groundwater samples collected from the Plaintiffs' and Class Members' private household water supply wells. Plaintiffs and Class Members consumed contaminated water in these wells for decades without knowledge to the dangers of PFAS because of Defendants' failure to act on decades of knowledge proving its toxicity.

203.    Upon information and belief, the Defendants continued to manufacture, sell, and/or distribute AFFF containing toxic PFAS components to La Crosse for use at LSE.

204.    Concentrations of toxic PFAS components found in the wells throughout the Class Area have been caused by LSE's releases of Defendants' AFFF, and its toxic PFAS components, to the environment. As was reasonably foreseeable by Defendants, fire training, fire response, and other uses of AFFF occurred on, and/or resulted in discharges to, open ground and stormwater systems. As was reasonably foreseeable by Defendants' AFFF, including toxic PFAS components, migrated into and through the soil and groundwater and from there migrated to and contaminated household water supplies throughout the Class Area. Thereby, the Plaintiffs and

Class Members have been, and continue to be, significantly exposed to PFAS contaminated household water supplies from their private wells. The PFAS contamination of Plaintiffs' and Class Members' household water is therefore directly caused by Defendants' manufacture, sale, and/or distribution of AFFF and its toxic PFAS components.

205.    It was and is reasonably foreseeable to Defendants that the Plaintiffs and Class Members would be harmed by consuming PFAS contaminated water resulting from releases of AFFF containing toxic PFAS components at LSE and their consumption of such contaminated household water.

206.    Defendants' internal memorandums proclaimed that "no reason" existed to alert outside agencies or the public to the toxic characteristics of PFAS despite repeated, consistent internal studies concluding PFAS are toxic, bioaccumulate, biomagnify, and are persistent in the environment and in human tissue. Defendants' failure to act on such information made it practically certain that a known toxic substance, PFAS, would continuously stream into the environment and be consumed by Plaintiffs and Class Members. As a direct and proximate cause of the costs Plaintiffs and Class Members have suffered and will continue to suffer injuries in the form of an increased risk of illness, disease, and disease process.

207.    Defendants knowingly manufactured, sold, and/or distributed a dangerous and defective product, AFFF containing toxic PFAS components, failed to provide sufficient warnings to protect bystanders, such as the Plaintiffs and Class Members, and failed to recall or redesign their products when they took them off the market and/or knew them to present a hazard to human health.

208.    Non-PFAS based products were available for fire suppression that would not have led to contamination of Plaintiffs' and Class Members' private drinking water supply.

209.     Upon information and belief, Defendants control a substantial share of the market in the United States for AFFF containing toxic PFAS components and are jointly responsible for the contamination of the groundwater, soil, and household water supplies in the Class Area and causing the injuries the Plaintiffs and Class Members have and will suffer.

210.     As a direct and proximate result of the Defendants' AFFF, and its toxic PFAS components contaminating groundwater in and around LSE, the Plaintiffs and Class Members have suffered, and will continue to suffer, injuries in the form of significant exposure to toxic PFAS components resulting in an increased risk of illness, disease, and disease process. Because of Plaintiffs and Class Members significant exposure to toxic PFAS components from AFFF and consequent increased risk of illness, disease, and disease process, they will suffer pecuniary injury of the costs for medically necessary diagnostic testing for the early detection of such illness, disease, and disease process.

**The Use, Storage, Release, Discharge, and Disposal of PFAS from AFFF at LSE Has Contaminated Plaintiffs' and Class Members' Properties Household Water**

211.     La Crosse began purchasing and using AFFF, and its toxic PFAS components, at LSE in about 1970.

212.     Over the following fifty years LSE discharged and disposed AFFF containing toxic PFAS components in and around the airport. LSE's discharge and disposal of AFFF, and its toxic PFAS components, has included, but is not limited to, releases and discharges into soil and water pathways that connect to property, wells, and water systems within the Class Area. Such PFAS discharges have resulted in infiltration of soil and migrated into groundwater and household water supply throughout the Class Area.

213.     For instance, testing, training, exercises, and fire response activities occurred on open ground at LSE, causing toxic PFAS waste to drain into soil, groundwater, surface waters,

wetlands, ponds, and ditches in and around LSE. Toxic PFAS components discharged to soil, surface waters, wetlands, and ponds have migrated into groundwater and contaminated the groundwater and private household wells throughout the Class Area where Plaintiffs' and Class Members' wells are located, contaminating their property and water supply.

214.    As of January 12, 2021, La Crosse reported to the public that it had completed PFAS testing of well water samples from 109 private wells, with 108 of said wells testing positive for PFAS.

215.    Months later, proof of French Island's pervasive contamination was reinforced. As of June 2021, 538 private wells on French Island tested positive for PFAS contamination.

216.    The widespread contamination led WDHS to declare an emergency water advisory for the Class Area in March 2021. Levels of PFOA and PFOS in drinking water wells on French Island had, at that time, been detected and reported at concentrations as high as 3,200 ppt.

217.    As a result of the contamination within the Class Area, Plaintiffs and Class Members have been exposed to and consumed toxic PFAS-laden water. Thus, Plaintiffs' and Class Members' risk of illness, disease, and disease processes have been increased. Plaintiffs and Class Members are now forced to suffer costs associated with diagnostic testing for early detection of such illness, disease, and disease processes.

**Specific Release, Discharge, Disposal, and Storage of PFAS-Based AFFF at LSE**

218.    Studies have preliminarily identified groundwater, surface water, and soil pathways where toxic PFAS components from AFFF used on LSE has been, and is currently, migrating to the Plaintiffs' and Class Members' groundwater and drinking wells.

///

219.     Initial Site Investigation Work Plan submitted by La Crosse to WDNR identified five potential source areas of PFAS contamination on French Island originating on LSE property: (1) Former Test Burn Pits: (2) a 1997 Fuel Spill, where AFFF was applied over the spilled jet fuel; (3) AFFF Test Area, where AFFF was discharged while annually collecting FAA-required sampled from firefighting equipment; (4) Former Fire Station, where AFFF was stored and transferred into firefighting equipment; and (5) 2001 Crash site, where AFFF was applied to wreckage. While these were the preliminarily identified sites, subsequent information indicates additional releases and discharges of AFFF, and its toxic PFAS components, occurred in LSE operation.

220.     Upon information and belief, Defendants began selling and distributing AFFF to La Crosse and/or LSE in the 1970s. Shortly thereafter, La Crosse and/or LSE created test burn pits in an area northwest of what is presently designated runway 22, east of runway 18, and north of runway 31. Firefighting training using AFFF was conducted at test burn pits at the airport from the 1970s through approximately 1988.

221.     In or about January 1997, a jet fuel spill occurred near an LSE terminal, and LSE firefighters applied AFFF to the spilled jet fuel.

222.     Over an approximately twenty-year period La Crosse and/or LSE conducted nozzle testing using AFFF in a test area northwest of the LSE fire station.

223.     For years, AFFF was stored in the former LSE fire station, where firefighters transported AFFF from the fire station into their equipment.

224.     In June 2001, a jet aircraft crash at LSE resulted in a fire. Upon information and belief, the Airport Fire Department owned and operated by La Crosse responded to the crash and sprayed AFFF at the crash site.

42

225.     An April 2021 Interim Site Investigation Report revised the above list to include a December 1, 2020, event when an AFFF solution was released from emergency response equipment by LSE personnel on or around a terminal apron.

226.     The Interim Site Investigation listed the above "confirmed sources" along with several "potential sources." Including:

(a) Practice burn activities near Fisherman Road (just outside the airport) reported by citizens during the 1970s.

(b) An aircraft crash on or about November 9, 1970, at 609 Dakota Street, northwest of the airport, across Lakeshore Drive. A La Crosse Tribune article, dated 11/10/1970, states, "Kenneth Kearns, La Crosse assistant fire chief, said two engines, a foam truck, a water wagon and a rescue unit answered the call." Additionally, the article states, "Dried foam covered plane wreckage like a snowy mist. Kearns said firemen didn't notice any flames, but put the foam on as a precautionary measure." A photo caption accompanying the article states, "Foam Sprayed on Wreckage By La Crosse Fire Department To Prevent Fire" and depicts firefighting foam on the wreckage and on the ground.

(c) A de-icing truck caught fire on January 3, 2014, at the terminal apron and airport fire responders and LCFD responded to the fire. Extinguishing agents used were described as "75 gallons of AFFF used and about 700 gallons of water" in the "ARFF [Aircraft Rescue and Fire Fighting] Run Report."

227.     Defendants have sold and/or distributed AFFF, and its toxic PFAS components, to La Crosse and LSE for approximately fifty years. Throughout that period, the toxic PFAS

43

components contained in Defendants' AFFF have been released into the environment in significant quantities and migrated into household water supplies throughout the Class Area. As a result, Plaintiffs and Class Members have been exposed to toxic PFAS components from AFFF and suffered increased risk of illness, disease, and disease processes that Defendants have for decades known accompany AFFF releases.

228.    State and Local entities have not yet analyzed the extent of PFAS contamination at numerous other locations where AFFF was used and escaped into the environment, including, but not limited to, neighborhoods along the surface and groundwater pathways from LSE to the Town, including the Class Area.

**Release, Discharge, and Disposal of PFAS is Contaminating Plaintiffs' and Class Members' Properties Household Water**

229.    Plaintiffs' and Class Members' groundwater and household water supply are contaminated with numerous types of toxic PFAS components contained in AFFF manufactured by Defendants.

230.    Samples taken from neighborhoods throughout French Island including the Class Area, discovered PFOS, PFOA, and other PFAS from Defendants' AFFF pervade the water supply.

231.    Since the EPA's UCMR3 sampling in 2014, PFAS from AFFF have continuously and increasingly been detected in French Island wells, including the Plaintiffs' and Class Members' wells, above recommended levels for public safety and welfare. June 2021 tests confirmed and expanded these results. In the June 2021 round of testing, 538 private wells on French Island tested positive for PFAS.

232.    Present significant exposure to toxic PFAS components from AFFF caused by Defendants presents an ongoing health risk to Plaintiffs and Class members. The toxic PFAS

components to which Plaintiffs and Class Members have been exposed because of their consumption of contaminated household water is biopersistent and so remains in their bodies for years, continuing to alter their bodies' structures and increase the risk of illness, disease, and disease process in Plaintiffs and Class Members.

**Plaintiffs and Class Members Have Been Injured by Defendants' Actions**

233.    Plaintiffs and Class Members hereby incorporate by reference the allegations contained in the proceeding paragraphs of this Complaint as if they were set forth herein.

234.    Private wells on Plaintiffs' and the Class Members' property have been and are being contaminated by toxic PFAS components from AFFF designed, manufactured, sold, and/or distributed by the Defendants. AFFF, and its toxic PFAS components, sold by the Defendants to LSE was used in an intended and foreseeable manner, released onto LSE property, and thereafter migrated into surrounding groundwater and private well supplies in the Class Area.

235.    It was reasonably foreseeable by Defendants that PFAS would be released into soil, groundwater, water systems, and water supplies by entities it sold and/or distributed AFFF. It was further reasonably foreseeable that Defendants' AFFF would migrate into Plaintiffs' and Class Members' properties, household water supplies, bodily tissue, and bloodstreams. Plaintiffs' and Class Members' possessory interests in their properties and therefore right to withdraw and or use their household water supply has been invaded and contaminated.

236.    PFAS have been detected in wells throughout the Class Area. Widespread contamination caused by the Defendants' tortious conduct has, and will continue to, increase the risk of illness, disease, and disease processes in Plaintiffs and Class Members.

///

///

237.     It was reasonably foreseeable to Defendants that Plaintiffs and Class Members, as occupants of residential real property and users of groundwater that supplied private wells, would consume household water contaminated by toxic PFAS components from AFFF. Therefore, it was reasonably foreseeable that the toxic PFAS components contained in Defendants' AFFF and would cause them to suffer an increased risk of illness, disease, and disease processes.

238.     PFAS are toxic, and will continue to cause bodily injury, to Plaintiffs and Class Members because they have had significant exposure to PFAS components of AFFF which bioaccumulate, alter bodily structures, and increase risk of illness, disease, and disease process.

239.     Defendants' conduct in designing, manufacturing, selling, and distributing AFFF when they knew, through its intended uses, AFFF would release toxic PFAS components into the environment, was wanton, malicious, oppressive, and done without regard for the rights and safety of others, including Plaintiffs and Class Members, justifying an award of punitive damages.

240.     As a result of Defendants' tortious conduct and the resulting contamination, Plaintiffs and Class Members consumed PFAS contaminated household water which has caused them to suffer an increased risk of illness, disease, disease processes because of such exposure. To appropriately address such increased risk, Plaintiffs and Class Members require an award of the cost of a program for medical monitoring for early detection and/or identification of such illness, disease, or disease processes. Early detection of such illness, disease, and/or disease processes will benefit Plaintiffs and Class Members.

241.     Plaintiffs and Class Members were significantly exposed to PFAS, increasing their risk of illness, disease, and disease process, and causing the medical necessity of

46

diagnostic testing for the early detection of latent or misidentified illness, disease, and disease process, and the resulting pecuniary loss of the costs of that testing, proximately caused by Defendants' tortious conduct.

242. Accordingly, Plaintiffs and Class Members seek compensation for the costs of medical monitoring for early detection of illness, disease, and disease processes beneficial to Plaintiffs and Class Members, and the costs of administration of that testing, or in the alternative the award of reasonable and necessary costs of the establishment of a court-supervised program of medical monitoring and diagnostic testing through equitable and/or injunctive relief.

243. Because precise identification of the specific manufacturer of any given AFFF that was the source of toxic PFAS components found in Plaintiffs' and Class Members' household water supply is difficult, Defendants are jointly and severally liable for the indivisible injuries which Defendants have caused Plaintiffs and Class Members to suffer.

244. Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS to profit from the use of AFFF containing toxic PFAS components, at Plaintiffs' and Class Members' expense, to foreseeably contaminate Plaintiffs' and Class Members' household water supplies, and to attempt to avoid liability for such contamination of the groundwater.

245. Enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of liability for AFFF containing toxic PFAS components at issue in this Complaint. Each of these Defendants participate in a state-wide and national market for AFFF containing PFOA and/or PFOS and/or other PFAS for use in AFFF during the relevant time.

///

246.     Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing PFOA and/or PFOS and/or other PFAS for use in AFFF.

247.     Enterprise liability attaches to all the named Defendants for placing defective products into the stream of commerce.

**PLAINTIFFS AND CLASS MEMBERS HAVE SUFFERED PAST AND PRESENT INJURY FOR WHICH THEY NEED DIAGNOSTIC TESTING DUE TO THEIR INCREASED RISK OF DISEASE CAUSED BY EXPOSURE TO TOXIC PFAS COMPONENTS CONTAINED IN DEFENDANTS' AFFF**

248.     Plaintiffs and Class Members have suffered past, present, and future injury as a result of their significant exposure to and consumption of household water contaminated with toxic PFAS components contained in Defendants' AFFF used and released at LSE. Plaintiffs and Class Members have ingested PFAS-contaminated water which was absorbed into their tissue and bloodstream. Because of their past significant exposure, Plaintiffs' and Class Members' have suffered past, present, and future increased risk of illness, disease, or disease process, including cancer, making it presently medically necessary that they undergo diagnostic testing for early detection of illness, disease, and disease process.

249.     PFAS are toxic and carcinogenic to humans. For decades, Defendants internal memorandum, outside scientific literature, and regulatory agencies have made clear that exposure to PFAS causes various adverse health effects, including cancer.

250.     Studies have made clear that exposure to PFAS bioaccumulates and results in toxic invasion and persistence in human tissue and bloodstreams, including Plaintiffs' and Class Members' tissue and bloodstreams, and altering the structure of their bodies.

///

251. Moreover, based on available scientific literature, exposure to toxic PFAS components places Plaintiffs and Class Members at increased risk of developing several serious illnesses, diseases, and disease processes.

252. With early detection and identification, Plaintiffs and Class Members can seek early treatment and prepare their lives accordingly for the toxic consequences of significant exposure to toxic PFAS components.

253. Defendants did not seek or obtain permission or consent from Plaintiffs or Class Members before engaging in tortious acts and/or omissions that caused, allowed, and/or resulted in their significant exposure to the known toxic PFAS components contained in Defendants' AFFF released from LSE.

254. As a proximate result of Defendants' tortious conduct, Plaintiffs and Class Members have been, are presently, and will continue to be at a significantly increased risk of illness, disease, or disease processes, including cancer. Plaintiffs' and Class Members increased risk of illness, disease, and disease process makes it reasonably medically necessary to incur, both now and in the future, the cost of diagnostic testing for the early detection of illness, disease, and disease processes arising from their exposure to toxic PFAS components.

255. Plaintiffs and Class Members have legally protected interests in not being exposed to harmful levels of toxic PFAS components contained in Defendants' AFFF which significantly increase their risk of illness, disease, and disease processes. Plaintiffs and Class Members also have legally protected interests in avoiding the past, present, and future medical need for expensive diagnostic tests and the pecuniary injury of the costs of medically necessary diagnostic tests.

///

256.     Plaintiffs and Class Members have been exposed to toxic PFAS components of AFFF. As a result of LSE's releases of Defendants' AFFF, and its toxic PFAS components, Plaintiffs' and Class Members' household water supply has been contaminated. Plaintiffs and Class Members relied on that water supply and therefore ingested and absorbed toxic PFAS components into their bloodstream and tissue. As a direct and proximate result of these releases, Plaintiffs and Class Members have suffered the past, present, and future need for diagnostic testing for the early detection and identification of PFAS-related illness, disease, and disease process.

257.     Defendants' tortious conduct constitutes an invasion of legally protected interest of Plaintiffs and Class Members and has injured Plaintiffs and Class Members. Plaintiffs and Class Members would not have suffered an increased risk of illness, disease, or disease process nor the consequent ongoing pecuniary injury of the need to incur costs of medically necessary diagnostic testing to identify the presence of illness, disease, or disease processes arising from their exposure to toxic PFAS components, but for the past and ongoing exposure they suffer as a proximate result of Defendants' tortious conduct.

258.     But for Defendants' tortious conduct, Plaintiffs and Class Members would not have suffered significant exposure to toxic PFAS components from Defendants' AFFF. Such exposure has made it medically reasonably necessary for Plaintiffs and Class Members to engage in diagnostic testing to monitor and identify latent illness, disease, and disease process. Diagnostic testing necessary to monitor and identify such illness, disease, and disease process requires Plaintiffs and Class Members to suffer pecuniary injury of the cost of such diagnostic testing.

///

259.    Medical monitoring is recognized as beneficial for early detection where there is an increased risk of disease from exposure to hazardous substances.[23] The purpose of medical monitoring in the form of diagnostic testing is the benefit of early identification of latent or unrecognized illness, disease, or disease process. Early detection is beneficial because treatment can then be given to reduce the impacts of the toxic exposure.[24] Medical monitoring is widely accepted as prudent response to toxic exposure.[25]

260.    Diagnostic testing procedures exist that make early detection the toxic effects of PFAS possible. These programs will benefit Plaintiffs and Class Members because they will allow for the early detection of latent or unrecognized disease associated with PFAS. Identifying cancer and other serious illness, disease, and disease process early allows greater treatment options, improves patient prognoses, and avoids more invasive, risky, and expensive medical interventions after an inaccurate diagnosis. Plaintiffs' and Class Members' overall medical outlook depends on early diagnosis; the sooner a person is checked, the better the ultimate outcome.[26]

261.    Periodic diagnostic testing for the early detection of illness, disease, and disease process conforms to standards of medical care and are reasonably necessary to ensure that illness, disease, and disease processes can be identified early and treated aggressively. Effective diagnostic tests exist for reliable early detection. Early detection combined with effective

---

[23] ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA, 60 F.R. 38841, July 28, 1995.
[24] *Id.*
[25] See http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf (last accessed Sept. 19, 2023); Dept. of Enviro. Health, *Ferland Medical Monitoring Program*, UNIVERSITY OF CINCINNATI COLLEGE OF MEDICINE, https://med.uc.edu/eh/research/projects/fcc/fmmp-history (last accessed Sept. 19, 2023); Enviro Health & Safety, *Pesticide Users Medical Monitoring Program*, UNIVERSITY OF FLORIDA (revised Jan. 21, 2014) http://www.ehs.ufl.edu/pgorams/ih/pesticide/ (last accessed Sept. 19, 2023); World trade Center Health Program, *About the Program*, CENTERS FOR 379.
[26] https://www.cancer.org/content/dam/CRC/PDF/Public/8671.00.pdf (last accessed Sept. 19, 2023).

treatment significantly decrease the severity of the illness, disease, disease process, or injury.[27] The present value of costs of such tests is calculable, and Plaintiffs and Class Members will prove such costs at trial.

262. For example, Plaintiffs and Class Members exposed to PFAS from AFFF have been significantly exposed to PFOA, a known toxic substance.

263. Plaintiffs' and Class Members' exposure to PFOA has caused them to suffer an increased risk of thyroid disease. Monitoring procedures exist for early detection of thyroid disease through thyroid screening, including blood samples to measure thyroid stimulating hormone, and monitoring strategies to assess the progression of the disease.

264. Plaintiffs' and Class Members' exposure to PFOA has caused them to suffer an increased risk of testicular cancer. Monitoring procedures exist for early detection of testicular cancer through use of testicular examinations and ultrasound procedures.

265. Plaintiffs' and Class Members' exposure to PFOA has caused them to suffer an increased risk of kidney cancer. Monitoring procedures exist for early detection of kidney cancer through use of screening for its presence by medical questionnaires, abdominal examinations, and urine tests. Additional testing mechanisms including MRIs, CT scans, and ultrasounds allow for detection of disease symptoms.

266. These monitoring procedures are different in type, timing, frequency and/or scope from what would normally be recommended in the absence of exposure to toxic PFAS components. The general unexposed population does not receive procedures of the type, timing, frequency, and/or scope necessitated by significant exposure to toxic PFAS components from AFFF because these tests are designed to detect specific illnesses, diseases, and disease

---

[27] DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/wtc/about.html (last updated Dec. 15, 2017).

processes known to be associated with exposure to toxic PFAS components.

267.    Because of their exposure to toxic PFAS components contained in AFFF, Plaintiffs and Class Members require medically necessary diagnostic testing to diagnose the warnings signs of PFAS-related illness, disease, and/or disease processes. Early detection of illness, disease, and disease processes caused by exposure to toxic PFAS components allows Plaintiffs and Class Members more treatment options, reduces treatment costs, and increases their chances of an improved outcome.  The progression from subcellular and/or other latent alterations in the structure and function of Plaintiffs' and Class Members' bodies to the outward manifestation of serious disease can be delayed for years. If such illness, disease, or disease process is permitted to develop until it becomes obvious, patent, or recognized, Plaintiffs and Class Members will have lost valuable time and disease progress and will likely suffer more severe or long-term health effects and require more costly interventions.

268.    As a direct and proximate result of Defendants' tortious conduct Plaintiffs and Class Members suffered significant exposure to toxic PFAS components of Defendants' AFFF which significantly increased their risk of illness, disease, and disease, process. Therefore, Plaintiffs' and Class Members' have in the past and presently need to incur the cost diagnostic testing to monitor and identify latent illness, disease, and disease process.

## DEFINITION OF CLASS

269.    This action is brought by the Plaintiffs individually on their own behalf and as representatives of the class defined below seek to certify and maintain this matter as a class action pursuant to FRCP 23(b)(1), (b)(2), (b)(3), or alternatively (c)(4).

///

///

270.    The Members of the Medical Monitoring class are defined as:

All persons who on or after January 1, 1970, occupied residential real property with private wells within the Class Area and who obtained household water from those wells, and who:

during the period from birth up to their 20th birthday, consumed household water containing 20 ppt of PFOA or greater or were breastfed by a mother who consumed household water containing 20 ppt of PFOA or greater during breastfeeding at that residential real property for a cumulate time period of one year or more, or who

during the period from their 20th birthday or after, consumed household water at that residential real property they occupied for the number of days of consumption at specified PFOA water concentrations in Appendix A, or greater.

271.    The Class Geographic Area is defined as the Town of Campbell, Wisconsin.

272.    Excluded from the Class are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel of their immediate family members; and (d) any State or any of its agencies.

**Compliance with Fed. R. Civ. P. 23 Requirements**

273.    Plaintiffs and Class Members bring this action pursuant to FRCP Rule 23(a) and (b)(3), on behalf of themselves and all other persons similarly situated for the direct, proximate, and foreseeable injuries caused by exposure to and ingestion of toxic PFAS components in household water contaminated by AFFF released at LSE and designed, manufactured, sold, and/or distributed by Defendants. The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23 (a) and (b)(3).

(I)    <u>Numerosity</u>

274.    The members of the Class are so numerous that joinder of all members is impracticable.  The number of properties that used private wells for household water exceeds

five hundred.  There are over one thousand members of the Class who have been consumed

water from private wells contaminated with toxic PFAS components contained in Defendants'

AFFF released from LSE as described herein.  Members can be easily identified from public

records such as property tax records, public records of private well construction, and other public

records and sources such as Accurint, Intelius, and LexisNexis, and notified of the pendency of

this action by mail or via other public sources.

(II)     Typicality

275.    The Representative Plaintiffs' claims are typical of the claims of the members of

the Class since the members of the Class consumed household water from private wells in the

Class Area at levels and frequencies defined above resulting in injury to all members of the

Class. Plaintiffs and Class Members were and are similarly or identically harmed and their

claims arise from the same actions and/or inactions of Defendants. Plaintiffs and all Class

Members were exposed to toxic PFAS components from AFFF released from LSE and designed,

manufactured, sold, and/or distributed by Defendants. As a result, each Plaintiff and Class

Member reasonably requires present and future medical monitoring to ensure early detection of

illness, disease, and disease process caused by exposure to PFAS.

(III)     Adequate Representation

276.    The Representative Plaintiffs will fairly and adequately protect the interests of

members of the Class Members and have retained counsel competent and experienced in tort,

class action, and environmental litigation.

277.    The Representative Plaintiffs and their counsel are committed, and have the

resources, to vigorously prosecute this action on behalf of the class.

278.    There are no material conflicts between the claims and the Representative

Plaintiffs and Class Members that would make class certification inappropriate.

279.     Neither Plaintiffs nor their counsel have interests adverse to any of the other Plaintiffs or the other members of the Class.

(IV)   <u>Predominance of Common Questions</u>

280.     Plaintiffs and Class Members bring this action under Rule 23(b)(3) because numerous questions of law and fact common to Class Members predominate over any question affecting only individual members. The answers to these common questions will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

(a) the type or kinds of toxic PFAS components that have been and are being released from AFFF used at LSE;

(b) the activities of Defendants have resulted in the contamination of the household water supplies relied on by the Plaintiffs and the Class Members with AFFF containing toxic PFAS components;

(c) the nature and toxicity of the toxic PFAS components from AFFF released from LSE;

(d) whether Defendants owed a duty to Plaintiffs and Class Members;

(e) whether Defendants breached a duty owed to Plaintiffs and Class Members;

(f) whether Defendants knew or should have known that their manufacture, sale, and/or distribution of AFFF containing toxic PFAS components was unreasonably dangerous;

(g) whether Defendant knew or should have known that the toxic PFAS components in their AFFF were and are persistent, stable, and mobile and

were likely to contaminate household supplies;

(h) whether Defendants were negligent in their design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, to LSE;

(i) whether Defendants failed to sufficiently warn users of the potential for harm that resulted from the toxic PFAS components contained in their AFFF;

(j) whether Defendants became aware of health and environmental harm caused by toxic PFAS components in their AFFF and failed to warn users and Plaintiffs and Class Members of the same;

(k) whether Plaintiffs and Class Members have been significantly exposed to toxic PFAS components as a result of Defendants design, manufacture, sale, and/or distribution of AFFF containing toxic PFAS components;

(l) whether Defendants' actions constitute a trespass;

(m) whether Defendants' actions constitute a nuisance;

(n) whether Defendants' actions constitute a battery;

(o)  whether Defendants' conduct was wanton, malicious, or oppressive and in reckless disregard for the rights and safety of Plaintiffs and the Class Members;

(p) whether Plaintiffs and Class Members have suffered and will continue to suffer increased risk of illness, disease, and disease process as a result of their exposure to toxic PFAS components as a result of Defendants' design, manufacture, sale, and/or distribution of AFFF;

(q) whether the members of the class have sustained injury in the form of the need for and cost of medical monitoring;

(r)   whether it is reasonably medically necessary for Plaintiffs and Class Members to receive medical monitoring for the early detection of illness, disease, or disease process as injuries;

(s)   whether Plaintiffs and Class Members are entitled to equitable medical monitoring relief they seek herein;

(t)   whether a court-supervised medical monitoring program should be established to mitigate or reduce the risk of illness, disease, and disease process as a result of exposure toxic PFAS components from AFFF released at and around LSE and designed, manufactured, sold, and/or distributed by Defendants;

(u)   whether Defendants are strictly liable to Plaintiffs and Class Members for their actions; and

(v)   whether Defendants were unjustly enriched by their actions at the expense of the Plaintiffs and Class Members.

(V)   <u>Superiority</u>

281.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

282.   Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final legal and/or equitable relief with respect to the Class as a whole.

283.   Furthermore, the expense and burden of individual litigation outweighs the individual injuries suffered by individual Class Members, making it impossible for members of the Class to individually redress the wrongs done to them.

284.   Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

285.    There will be no difficulty in the management of this action as a class action.

## RULE 23(b)(2) EQUITABLE RELIEF REQUIREMENTS

286.    In addition to, or in the alternative to, the above, Plaintiffs and Class Members bring this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class Members as a whole, such that final equitable relief is appropriate respecting the class as a whole.

287.    Defendants have acted and/or refused to act on grounds applicable generally to the Class Members as a whole. Defendants' design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, resulted in releases into the environment, including at and around LSE, which they knew or should have known would occur through the ordinary and intended uses of the AFFF.

288.    Defendants' decision to not make known the toxic characteristics of PFAS components contained in AFFF when they knew or should have known that PFAS are highly toxic, mobile, and persistent in the environment resulted in the continued release of the product into Plaintiffs and Class Members' household water supplies. Accordingly, Defendants' acts and/or refusal to act have similarly affected Plaintiffs and Class Members as a whole because it has resulted in contamination of their household water supplies, exposure to and/or ingestion of PFAS, and an increased risk of illness, disease, and disease process.

289.    Equitable relief sought by Plaintiffs and Class Members includes, but is not limited to, the implementation and funding of a medical monitoring program for the Plaintiffs and Class Members sufficient to monitor the health of the Plaintiffs and Class Members to ensure the beneficial early detection of illness, disease, and disease process caused by exposure to toxic PFAS components of AFFF designed, manufactured, sold, and/or distributed by

Defendants. Court supervised programs such as medical monitoring are paradigmatic of equitable relief intended to mitigate or prevent the risk of illness, disease, and disease process caused by Defendants' acts and omissions. Therefore, Plaintiffs and Class Members seek establishment of a common program of diagnostic testing because of common conduct that will benefit the class as a whole.

290.    Plaintiffs and Class Members present a cohesive class because each of the members have been significantly exposed to toxic PFAS components contained in AFFF which presents an increased risk of illness, disease, and disease process to the class as a whole. Further, medical monitoring and diagnosis programs exist to which benefit Plaintiffs and Class Members because they will not be forced to allow latent illness, disease, or disease process to become manifest.

## RULE 23(C)(4) REQUIREMENTS

291.    In the alternative, this case is properly maintained as a class action with respect to the following issues under FRCP 23(C)(4):

(a) The liability of Defendants and others under Plaintiffs' and Class Members' claims for relief resulting from of LSE's releases AFFF containing toxic PFAS components designed, manufactured, sold, and/or distributed by Defendants;

(b) The liability of Defendants for Plaintiffs' and Class Members' exposure to toxic PFAS components, including under legal theories of nuisance, negligence, failure to warn, defective design, unjust enrichment, and battery;

(c) Whether Plaintiffs and Class Members have been exposed to toxic PFAS components contained in Defendants' AFFF;

(d) The nature and types of toxic PFAS components which are contained in AFFF

designed, manufactured, sold, and/or distributed by Defendants;

(e) The nature and toxicity of the PFAS components contained in AFFF designed, manufactured, sold, and/or distributed by Defendants;

(f) Whether Defendants knew or should have known of the nature and toxicity of the PFAS components in AFFF they designed, manufactured, sold, and/or distributed;

(g) Whether Defendants negligent and/or tortious conduct caused Plaintiffs' and Class Members' significant exposure to toxic PFAS components contained in Defendants' AFFF;

(h) Whether Defendants knew or should have known that their design, manufacture, sale, and/or distribution AFFF containing toxic PFAS components would contaminate Plaintiffs' and Class Members' properties and household water supplies;

(i) Whether, as a result of exposure to toxic PFAS components contained in Defendants' AFFF, Plaintiffs and Class Members suffer an increased risk of contracting serious latent illness, disease, and disease process;

(j) Whether exposure to toxic PFAS components contained in Defendants' AFFF caused Plaintiffs' and Class Members' medical need for diagnostic testing for early detection of illness, disease, and disease process;

(k) Whether diagnostic testing exist for the beneficial early detection of illness, disease, or disease process caused by PFAS;

(l) Whether the reasonably medically necessary diagnostic testing is different from medical procedures normally recommended in the absence of exposure; and

(m) Whether Plaintiffs' and Class Members' exposure to toxic PFAS components from AFFF has made a program of medical monitoring, including diagnostic testing for early detection of illness, disease, or disease process, reasonably necessary.

292.    The above referenced issues would materially advance the present claims for relief as required pursuant to Rule 23(c)(4). Therefore, the above referenced issues are of the type for which certification pursuant Rule 23(c)(4) is appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NUISANCE
(All Defendants)

293.    Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

294.    Defendants' manufacture, sale, and/or distribution of AFFF containing toxic PFAS components thereof constitutes intentional, negligent and/or unreasonably dangerous activity causing unreasonable and substantial interference with the use and enjoyment of the Plaintiffs' and Class Members' property interests.

295.    Defendants knew and/or should have reasonably foreseen that the invasion of the Plaintiffs' and Class Members' property interests, including their household water supplies, was substantially certain to result from the use of AFFF, and its toxic PFAS components, as Defendants intended, including by LSE. Defendants participated to a substantial extent in the creation, and carrying on, of the nuisance by its actions described above.

296.    Defendants' unreasonable and substantial interference with the use and enjoyment of the Plaintiffs' and Class Members' property interests includes but is not limited to the

contamination of groundwater and soil on Plaintiffs' and Class Members' property and the resulting significant exposure to household water containing the toxic PFAS components of AFFF.

297.    Defendants' manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, constitutes a pattern of continuous and ongoing tortious conduct.

298.    Toxic PFAS components continue to contaminate, and be present in, Plaintiffs' and Class Members' bloodstream and tissue and altering their bodies' structures posing an increased risk of illness, disease, and disease process.

299.    As a result of Defendants' creation of a nuisance, the groundwater supply of private wells relied upon in the Class Area was contaminated with toxic PFAS components from Defendants' AFFF.

300.    Defendants' creation of a nuisance has caused Plaintiffs and Class Members substantial and unreasonable interference with their property rights, including causing significant exposure of Plaintiffs and Class Members to household water contaminated with toxic PFAS components from AFFF.

301.    As a direct result of Defendants' conduct, as set forth above, Plaintiffs' and Class Members' property rights and interests, including their rights to free and unthreatened use and enjoyment of their property, has been and will be interfered with unreasonably.

302.    Defendants' creation of a nuisance caused, is causing, and will continue to cause Plaintiffs and Class Members a significant increased risk of illness, disease, disease process due to the presence of toxic PFAS components in Defendants' AFFF in their household water and bodies.

///

303.     Defendants' invasion of Plaintiffs' and Class Members' properties was intentional and unreasonable.

304.     Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the Plaintiffs and Class Members because Defendants knew or should have known their actions and inactions were substantially certain to interfere with and invade Plaintiffs' and Class Members' property rights and interests. Defendants have known or reasonably should have known for years that their continued design, manufacture, sale, and/or distribution of AFFF containing toxic PFAS components, was substantially certain to result in releases of PFAS into the soil, groundwater, household water systems, and household water supplies in the Class Area thereby contaminating Plaintiffs' and Class Members' water supply and exposing them to toxic PFAS components.

305.     As a direct result of Defendants' tortious conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, private wells, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class Members have incurred and will incur the injury identified in paragraphs 238 through 247.

## SECOND CLAIM FOR RELIEF
### NEGLIGENCE
(All Defendants)

306.     Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

307.     At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF, and its toxic PFAS components.

308.     Defendants had a duty to manufacture, market, sell and/or distribute their AFFF in a manner that avoided contamination of the environment and of household water

supplies with known hazardous substances and avoided harm to those who would foreseeably be exposed to its toxic PFAS components.

309.   This duty included identifying, designing, using, and manufacturing alternatives to the toxic PFAS components used in its Defendants' AFFF.

310.   Defendants knew or should have known that the manufacture of AFFF containing toxic PFAS components was hazardous to human health and the environment. Knowing of the dangerous and toxic properties of the AFFF, Defendants had the duty to warn of the hazards of ingesting water containing toxic PFAS components.

311.   Defendants knew or should have known that the foreseeable storage, use, and disposal of AFFF, and its toxic PFAS components, would result in AFFF migrating into groundwater and household water supplies. Defendants knew or should have known that once AFFF, and its toxic PFAS component, migrated into water it would persist there for decades, and cause significant exposure and increased risks of illness, disease, and disease process.

312.   Defendants further knew or should have known that it was unsafe, unreasonably dangerous, and/or hazardous to manufacture AFFF using toxic PFAS components because it was highly probable that toxic PFAS components would migrate into the environment surrounding airports, including LSE, and contaminate the groundwater used to supply household water.

313.   Given the likelihood that sites where Defendants sold and/or distributed AFFF, including LSE, would become contaminated with toxic PFAS components, Defendants had a duty to investigate the extent to which the toxic PFAS components in AFFF released from such sites were likely to migrate and contaminate Plaintiffs' and Class Members' properties and household water supplies.

314.     Defendants knew or should have known that the manufacture of AFFF containing toxic PFAS components was hazardous to human health and the environment.

315.     Knowing of the dangerous and hazardous properties of the AFFF, Defendants had the duty to warn of the hazards of ingesting water containing toxic PFAS components.

316.     The Plaintiffs and the Class Members were foreseeable victims of the harm caused by Defendants' AFFF containing toxic PFAS components.

317.     Defendants negligently designed, engineered, developed, fabricated, and tested AFFF, and its toxic PFAS components, and the associated warnings, or lack thereof, and thereby failed to exercise reasonable care to prevent the AFFF, and its toxic PFAS components, from presenting an unreasonable risk of harm to human health and the environment and persons who would come in contact with it, including Plaintiffs and the Class Members.

318.     As a result of Defendants' breaches of their legal duties, the groundwater water and private wells surrounding LSE including the affected groundwater in the Class Area, have been, and at continue to be, contaminated with toxic PFAS components.

319.     Defendants' negligent manufacture, sale, and/or distribution of AFFF and their negligent misrepresentation and failure to warn, has caused significant exposure to toxic PFAS components resulting in past and ongoing increased risk of illness, disease, and disease process to Plaintiffs and Class Members due to the presence of toxic PFAS components in their household water supply.

320.     Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

///

///

321.     As a direct result of Defendants' tortious conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, private wells, and other property, by the PFAS components of the Defendants' AFFF, the Plaintiffs and Class Members have incurred and will incur the injury identified in paragraphs 238 through 247.

## THIRD CLAIM FOR RELIEF
## NEGLIGENT FAILURE TO WARN
### (All Defendants)

322.     Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

323.     At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, and distributing AFFF containing toxic PFAS components.

324.     As manufacturers, sellers, and distributors of a commercial product, AFFF the Defendants had a duty to provide full and adequate instructions and warnings about the health or injury risks posed by their products.

325.     Defendants knew or should have known that the foreseeable storage, use, and disposal of the AFFF, and its toxic PFAS components, that they manufactured, sold, and/or distributed to airports, including LSE, would enter the water supply, persist there for decades, cause risks to human health and the environment, and injure Plaintiffs and Class Members.

326.     At the time of the design, manufacture, sale, and/or distribution of the AFFF, Defendants knew or should have known of the dangerous properties of the toxic PFAS components in their AFFF.

327.     At significant times Defendants knew of AFFF, and its toxic PFAS components, dangerous properties and failed to provide sufficient warnings to the users of AFFF, including LSE, that use and release of their AFFF, and its toxic PFAS components, into

the environment would result in the contamination of groundwater, household water supplies, and significant health risks to those who consumed such PFAS contaminated water supplies.

328.    The Defendants failed to provide adequate warnings to the users of the dangers to human health and the environment if the toxic PFAS components contained in Defendants' AFFF was permitted to contaminate the groundwater and water supplies.

329.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release of AFFF containing toxic PFAS components.

330.    Had Defendants provided adequate warnings, the users of their AFFF would have either not used AFFF, or taken measures to store, use, and dispose of AFFF in a manner that reduced or eliminated groundwater and household water contamination from the toxic PFAS components contained in AFFF.

331.    As a direct and proximate result of Defendants' failure to warn against the likelihood of contamination from their AFFF, Plaintiffs' and Class Members' private wells in the Class Area has been contaminated with toxic PFAS components.

332.    As a direct and proximate result of Defendants' failure to warn of the environmental and health impacts caused by their AFFF, and the release thereof, the groundwater and household water supplies in Class Area became contaminated with toxic PFAS.

333.    Defendants' failure to provide adequate warnings or instructions renders Defendants' AFFF, and its toxic PFAS components, a defective product.

///

///

334.     As a result of Defendants' manufacture, sale, and/or distribution of a defective product, AFFF containing toxic PFAS components, Defendants are strictly liable for injuries suffered by the Plaintiffs and Class Members.

335.     Defendants' acts were willful, wanton, and/or reckless and conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

336.     As a direct result of Defendants' tortious conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, private wells, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class Members have incurred and will incur the injury identified in paragraphs 238 through 247.

### FOURTH CLAIM FOR RELIEF
### DEFECTIVE PRODUCT, DEFECTIVE DESIGN
(All Defendants)

337.     Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

338.     At all times relevant, Defendants were in the business of, among other things, manufacturing, selling and/or otherwise distributing AFFF containing toxic PFAS components.

339.     It was foreseeable that AFFF, and its toxic PFAS components, that Defendants manufactured, sold, and/or distributed would enter the water supply of the Plaintiffs and the Class Members and cause exposure to toxic PFAS components of AFFF and significant increased risk of illness, disease, and disease process.

340.     Alternative designs and formulations of AFFF without toxic PFAS components were available, technologically feasible, practical, effective, and would have reduced or prevented the reasonably foreseeable risks of harm to Plaintiffs and the Class Members.

///

341.     Further, design, formulation, manufacture, sale, and/or distribution AFFF containing PFAS components that were so toxic, mobile, and persistent in the environment was unreasonably dangerous.

342.     AFFF manufactured, sold, and/or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design. Because Defendants have failed to do so, they continue to sell and distribute an unreasonably dangerous product, AFFF containing toxic PFAS components.

343.     Defendants' AFFF containing toxic PFAS components was defective at the time of manufacture, and thus, at the time they left Defendants' control.

344.     As a result of Defendants' manufacture, sale and/or distribution of a defectively designed product, AFFF containing toxic PFAS components, the groundwater and household water supply in private wells within the Class Area became contaminated with toxic PFAS components. Plaintiffs and Class Members consumed and ingested such PFAS contaminated water which resulted in absorption of the toxic PFAS components in Defendants' AFFF into their bloodstream and tissue. Such absorption causes Plaintiffs' and Class Members' bodies' structures to be altered and subjects them to a significant increased risk of illness, disease, and disease process.

345.     As a result of Defendants' design, formulation, manufacture, sale and distribution of a defective product, Defendants are strictly liable in damages for the injuries suffered by Plaintiffs and the Class Members.

346.     Defendants' acts were willful, wanton, and/or reckless and conducted the design, manufacture, sale, and distribution of PFAS-based AFFF with a reckless indifference to

the rights of Plaintiffs and Class Members.

347.    As a direct result of Defendants' tortious conduct and resulting contamination of

Plaintiffs' and Class Members' household water supply, water systems, private wells, and other

property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class

Members have incurred and will incur the injury identified in paragraphs 238 through 247.

**FIFTH CLAIM FOR RELIEF**
**TRESPASS**
(All Defendants)

348.    Plaintiffs and Class Members incorporate by reference the allegations in the

preceding paragraphs as if fully set forth herein.

349.    Defendants took intentional actions and made intentional omissions in the

manufacture, sale and/or distribution of AFFF, and its toxic PFAS components, which in their

natural course caused the PFAS contamination of the Plaintiffs' and Class Members' household

water supply. Defendants' deliberate and intentional design, manufacture, marketing, sale, and/or

distribution of AFFF that contained toxic PFAS components made it natural, inevitable, and a

substantial certainty that releases of such AFFF from LSE would migrate into and contaminate

household well water supplies in the Class Area.

350.    Plaintiffs and Class Members in no way consented or provided permission to

Defendants' conduct which inevitably resulted in AFFF containing toxic PFAS components

entry onto and contamination of Plaintiffs' and Class Members' residential real property. As a

result, Plaintiffs and Class Members were exposed to and consumed toxic PFAS components

which have invaded their bodies, bloodstream, and tissue. These trespasses occurred in the past,

are occurring, and will continue to occur.

///

351.     The physical intrusion of toxic PFAS components contained in AFFF designed, manufactured, sold, and/or distributed by Defendants and released by LSE onto and into Plaintiffs' and Class Members' properties has injured Plaintiffs and Class Members. The household water they relied on, and consumed, has been, and is, contaminated with toxic PFAS components. As a result, Plaintiffs and Class Members have suffered significant exposure to PFAS and an increased risk of illness, disease, and disease process.

352.     The toxic PFAS contaminating Plaintiffs' and Class Members' properties and water supplies would not have been, and would not be, present but for the Defendants' tortious acts and omissions. Further, Plaintiffs and Class Members would not have consumed household water containing toxic PFAS but for Defendants' tortious conduct. The physical intrusion of Defendants' toxic PFAS components onto property occupied by Plaintiffs and Class Members has caused injuries including an increased risk of illness, disease, and disease process.

353.     Defendants actually and proximately caused the PFAS contamination of Plaintiffs' and Class Members residential real property, household water. Consumption of such PFAS contaminated household water has resulted in their bodies, bloodstreams, and tissue absorbing toxic PFAS components which continue to alter their bodies' structures.

354.     Defendants' conduct was a substantial factor in the design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, intended for use, discharge, release, and disposal of AFFF at and around LSE which migrated into Plaintiffs and Class Members residential real property, bodies structures, bloodstream, and tissue.

355.     As a direct result of Defendants conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, private wells, and other real property by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class

Members have incurred and will incur the injury identified in paragraphs 238 through 247.

**SIXTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
(All Defendants)

356.    Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

357.    Plaintiffs and Class Members have conferred a benefit upon the Defendant by bearing the burden of the PFAS contaminated soil, groundwater, water systems, and household water that would not have been and would not be present but for the Defendants' tortious conduct. Because the Defendants have failed, and refused to, take responsibility for the costs of the pervasiveness, persistence, and toxicity of Defendants' AFFF, and its toxic PFAS components, they have saved substantial sums of money they otherwise should have been required to expend to avoid the injuries suffered by the Plaintiffs and Class Members. Instead, Plaintiffs and Class Members have been forced to suffer the pecuniary injury of obtaining medically reasonably and necessary diagnostic testing and monitoring because of their increased risk of illness, disease, and disease process.

358.    Defendants knew or should have known of the benefit that Plaintiffs and Class Members have conferred and continue to confer upon them. Defendants profited from the manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components. Defendants continued to profit from the manufacture, sale, and/or distribution of such products for decades after they knew or should have known of the environmental and health risks they posed. Therefore, Defendants had knowledge of the profit and benefits they were receiving, and continue to receive, at the expense of the injuries suffered by Plaintiffs and Class Members.

///

359.     Defendants knew or should have known that their AFFF, and its toxic components, caused injuries to Plaintiffs' and Class Members' and their property rights and interests which Defendants did not bear financial cost to correct. This conduct resulted in a benefit to the Defendants, and they have not been required to shoulder the burden of the injury Plaintiffs and Class Members have suffered as a result.

360.     Defendants have accepted and/or retained the benefit Plaintiffs and Class Members have conferred, and continue to confer, upon them under circumstances such that it is inequitable for them to retain the benefit gained without payment to the Plaintiffs and Class Members. Defendants profited from the manufacture and sale of AFFF, and its toxic PFAS components, at the expense of Plaintiffs and Class Members health, and continued to do so long after they were aware of the environmental and health risks of their AFFF products. Defendants have failed to redesign or recall their products to prevent further release of their AFFF, and its toxic PFAS components, into the environment and Plaintiffs' and Class Members' soil, groundwater, water systems, and household water supply. Plaintiffs and Class Members have been injured by this conduct and are unable to bear the burden of Defendants' consciously, and tortiously, wrongful acts and omissions.

361.     It is inequitable for Plaintiffs and Class Members to suffer the injuries caused by Defendants' actions and omissions when Defendants knew, should have known, and/or disregarded the risk that their AFFF, and its toxic PFAS components, was highly mobile, persistent, toxic, bioaccumulative, and likely to be released into Plaintiffs' and Class Members' water supply through its intended use.

362.     Through Defendants' actions and inaction at the expense of Plaintiffs and Class Members, Defendants have been unjustly enriched.

363. The Court should award as a remedy the expenditures saved and the profits obtained by Defendants at the expense of Plaintiffs and the Class Members.

## SEVENTH CLAIM FOR RELIEF
### BATTERY
(All Defendants)

364. Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

365. Defendants' intentional tortious conduct has caused, is causing, and will continue to cause harmful and offensive contact with Plaintiffs and Class Members.

366. As a result of Defendants' tortious conduct, releases of toxic PFAS components in AFFF into ground and household water supplies have foreseeably migrated into the Class Area and exposed Plaintiffs and Class Members to household water which contained toxic PFAS components. Toxic PFAS components consumed by Plaintiffs and Class Members were absorbed into their bloodstream and body tissues and continue to alter their bodies' structures which constitutes harmful and offensive contact.

367. Defendants' intentional tortious conduct caused bodily harm to the Plaintiffs and Class Members in a way not justified by Plaintiffs' and Class Members' apparent wishes or by any privilege, and the contact was in fact harmful and/or against Plaintiffs' and Class Members will.

368. Defendants' intentional tortious conduct included:

(a) the sale of AFFF containing toxic PFAS components to be used, as intended, in a manner that would inevitably cause contamination of household water which would be consumed by persons using that household water including Plaintiffs and Class Members.

(b) concealment of Defendants' studies and decades of knowledge that AFFF, and its toxic PFAS components, chemical characteristics made them substantially certain to harm Plaintiffs and Class Members who were exposed to, and contacted by, PFAS unknowingly, without permission, and against their will.

(c) Continuous manufacture, sale, and/or distribution of AFFF containing toxic PFAS components when Defendants were aware PFAS are toxic and highly mobile and persistent in the environment.

(d) Defendants' eschewing misinformation denying scientific certainty about the toxicity of the toxic PFAS components contained in their AFFF in order to continue manufacturing, sell, and/or distribute such products.

(e) Defendants' refusal to redesign and/or recall AFFF containing toxic PFAS components, which they admitted was harmful despite being aware it would continue to be used, and therefore, contaminate water supplies, and contact Plaintiffs and Class Members.

369.    Defendants lacked any privilege or consent to cause harmful and offensive contact with Plaintiffs and Class Members by the toxic PFAS components of AFFF they knew would be released into the environment, contaminate household water supplies, and expose Plaintiffs and Class Members to PFAS contaminated water supplies without their consent.

370.    Defendants' contact was harmful because it altered the structure, form, and/or physical condition of Plaintiffs' and Class Members' bodies and increased their risk of suffering illness, disease, or disease process.

371.    Defendants' contact with Plaintiffs and Class Members was offensive in that contact with PFAS-contaminated water is offensive to a person with reasonable sense of personal

dignity. Such contact would offend the ordinary person and not one unduly sensitive as to his personal dignity. Defendants' contact was therefore unwarranted by the social usages prevalent at the time and place at which it was inflicted.

372.     Defendants' actions constituted constructive intent to injury; their intent to injure may be inferred from their conduct which was likely to threaten the safety of others and was so reckless or manifestly indifferent to the consequences Defendants were practically certain their acts and omissions would cause harmful and offensive contact.

373.     As set forth above, Defendants' conduct was intentional, malicious, and in complete disregard of Plaintiffs' and Class Members' rights, subjecting Defendants to awards of punitive damages.

374.     As a result of Defendants' tortious conduct, Plaintiffs and Class Members suffered bodily harm in the form of alteration of the physical condition, structure, and/or function of their bodies, resulting from their significant exposure to PFAS-contaminated water supplies.

375.     As a direct result of Defendants conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, private wells, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class Members have incurred and will incur the injury identified in paragraphs 238 through 247.

### EIGHTH CLAIM FOR RELIEF
### VIOLATION OF WISCONSIN UNIFORM FRAUDULENT TRANSFER ACT
(E.I. du Pont de Nemours and Company, The Chemours Company,
The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)

376.     Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

377.     Plaintiffs and Class Members seek equitable and other relief pursuant to the Wisconsin Uniform Fraudulent Transfer Act (*hereinafter* "UFTA) against E.I. DuPont,

Chemours, Chemours Company, Corteva, and DuPont (collectively the "DuPont Defendants").
Wis. Stat. §242.04(1), et seq.

378.    Under the UFTA, "[a] transfer made or obligation incurred by a debtor is
fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was
made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without
receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(i) was engaged or was about to engage in a business or a transaction for which the remaining
assets of the debtors were unreasonably small in relation to the business or transaction; or (ii)
intended to incur, or believed or reasonably should have believed that the debtor would incur
debts beyond the debtor's ability to pay as they became due." Wis. Stat. §242.04(1).

379.    The DuPont Defendants have (a) acted with actual intent to hinder, delay, and
defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the
transfer or obligation, and (i) were engaged or were about to engage in a business for which the
remaining assets of Chemours were unreasonably small in relation to the business; or (ii)
intended to incur, or believed or reasonably should have believed that Chemours would incur
debts beyond its ability to pay as they became due.

380.    The DuPont Defendants engaged in acts in furtherance of a scheme to transfer
E.I. DuPont's assets out of the reach of parties such as Plaintiff and Class Members that have
been injured because of the UFTA Defendants' conduct, omissions, and actions described in this
Complaint.

381.    It is primarily E.I. DuPont, rather than Chemours, that for decades manufactured,
marketed, sold, and/or distributed AFFF containing toxic PFAS components with the superior

knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen uses, would contaminate the Plaintiffs' and Class Members' household water supply and injure the Plaintiffs and Class Members.

382.    As a result of the transfer of assets and liabilities described in this Complaint, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all the liability for injuries from the manufacturing, marketing, sale, and/or distribution of AFFF containing toxic PFAS components.

383.    At the time of the transfer of its Performance Chemicals Business to Chemours, E.I. DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for injuries from the manufacturing, marketing, sale, and/or distribution of AFFF containing toxic PFAS components.

384.    The DuPont Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E.I. DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay as they became due.

385.    At all times relevant to this action, the claims, judgement, and potential judgments against Chemours potentially exceed Chemours' ability to pay.

386.    Pursuant to Wis. Stat. §242.04(1), Plaintiffs and Class Members seeks avoidance of the transfer of E.I. DuPont's liabilities for the claims brought in this Complaint and to hold the DuPont Defendants liable for any injuries or other remedies that may be awarded under this Complaint.

## DAMAGES SOUGHT BY THE CLASS

387.    Plaintiffs and Class Members incorporate by reference the allegations contained in the proceeding paragraphs as if they were fully set forth herein.

388.     Plaintiffs and Class Members seek an award of the costs of a program of medically necessary diagnostic testing for the early identification and detection of illness, disease, and/or disease process associated with significant exposure to chemical components of Defendants' AFFF containing toxic PFAS components.

///

///

///

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgement against the Defendants, as follows:

(a) for an order certifying the Class under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, designating Plaintiffs as the named representatives of the Class, and designated the undersigned as Class Counsel;

(b) Alternatively, an order certifying the Class under Fed. R. Civ. P. 23(a) and (b)(2);

(c) Alternatively, an order certifying the Class issues under Fed. R. Civ. P. 23(a) and (c)(4);

(d) An award to Plaintiffs and Class Members of compensatory and consequential damages, and/or equitable relief, including interest, in an amount to be proven at trial;

(e) for disgorgement of the profits and savings which were obtained by the unjust enrichment of Defendants through their manufacture and/or sale and distribution of AFFF containing toxic PFAS components and through the use and at the expense of the properties of Plaintiffs and Class Members:

(f) that this matter be scheduled for a jury trial;

(g) for judgment against Defendants for compensatory damages on all counts in a fair and just amount as established at trial;

(h) for disgorgement of the profits and savings which were obtained by the unjust enrichment of Defendants through their use of and at the expense of the properties of Plaintiffs and the Class Members;

(i)  An award of attorneys fees and costs as allows by law;

(j)  An award of pre- and post-judgment interest, as provided by law; and

(k) Such other and further relief as the court deems proper.


Date: October 12, 2023                    Respectfully submitted,

                                              FITZPATRICK, SKEMP & BUTLER, LLC

By: */s/ Timothy S. Jacobson*
Timothy S. Jacobson
Attorney Registration # 1018162
1123 Riders Club Rd.
Onalaska, WI 54650
Ph: (608)784-4370
tim@fitzpatrickskemp.com

SINGLETON SCHREIBER, LLP

By: */s/ Kevin S. Hannon*
Kevin S. Hannon
Attorney Registration # 1034348
1641 Downing Street
Denver, CO  80218
Ph: (720)704-6028
khannon@singletonschreiber.com

By: */s/ Paul Starita*
Paul Starita (*Pending Pro Hac Vice*)
591 Camino de la Reina #1025
San Diego, CA  92108
Ph: (720)704-6028
pstarita@singletonschreiber.com

By: */s/ Joseph A. Welsh*
Joseph A. Welsh (*Pending Pro Hac Vice*)
1641 Downing Street
Denver, CO  80218
Ph: (619)346-4580
jwelsh@singletonschreiber.com

**APPENDIX A**

Exposure Characteristics Expected to Cause Significant Increases in Peak or Cumulative Serum PFOA Concentrations and Health Risks

| Water PFOA Concentration (ppt) | Cumulative Days of Consumption |
|---|---|
| 20 | 2650 |
| 21 | 2263 |
| 22 | 1994 |
| 23 | 1791 |
| 24 | 1631 |
| 25 | 1501 |
| 26 | 1392 |
| 27 | 1299 |
| 28 | 1218 |
| 29 | 1148 |
| 30 | 1086 |
| 31 | 1031 |
| 32 | 981 |
| 33 | 936 |
| 34 | 895 |
| 35 | 858 |
| 36 | 824 |
| 37 | 792 |
| 38 | 763 |
| 39 | 736 |
| 40 | 711 |
| 41 | 688 |
| 42 | 666 |
| 43 | 646 |
| 44 | 626 |
| 45 | 608 |

| 46 | 591 |
|----|-----|
| 47 | 575 |
| 48 | 560 |
| 49 | 546 |
| 50 | 532 |
| 51 | 519 |
| 52 | 506 |
| 53 | 495 |
| 54 | 483 |
| 55 | 473 |
| 56 | 462 |
| 57 | 453 |
| 58 | 443 |
| 59 | 434 |
| 60 | 425 |
| 61 | 417 |
| 62 | 409 |
| 63 | 401 |
| 64 | 394 |
| 65 | 387 |
| 66 | 380 |
| 67 | 373 |
| 68 | 367 |
| 69 | 361 |
| 70 | 355 |